IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
*ex rel.* J. Michael Hayes,

CIVIL NO.: 12 CV 1015-S

Plaintiffs,

v.

Allstate Insurance Company;
Allstate Corporation;
Daimler Chrysler Insurance Company;
Erie Insurance  Company of New York;
Erie Insurance Company;
Erie Insurance Exchange, Inc.;
Erie Indemnity Company;
Farmers Insurance Group Companies;
Farmers Insurance Exchange;
Truck Insurance Exchange;
Fire Insurance Exchange;
Farmers Underwriters Association;
Foremost Insurance Group;
AIG;
GEICO Insurance;
Berkshire Hathaway, Inc.;
GMAC Insurance;
Maiden Holding Ltd.;
Kemper Independence Insurance Company;
Kemper Corporation;
Liberty Mutual Insurance Company;
Liberty Mutual Group;
Liberty Mutual Holding Company, Inc.;
Metropolitan Group Property and Casualty Insurance Company;
Metropolitan Property and Casualty Insurance;
Nationwide General Insurance Company;
Nationwide Financial Services, Inc.;
Nationwide Corporation;
Nationwide Mutual Insurance Company;
Nationwide Mutual Insurance Intercompany Pool;

Relator J. Michael Hayes'
Amended Complaint Filed
Pursuant to 31 U.S.C.
§§ 3729 -3732


Jury Trial Demanded

Nationwide;
New York Central Mutual Fire Insurance Company;
Preferred Mutual Insurance Company;
Progressive Insurance Company;
The Progressive Corporation;
The Prudential Insurance Company of America;
Prudential Financial, Inc.;
Republic-Franklin Insurance Company;
Utica Mutual Insurance Company;
Graphic Arts Mutual Insurance Company;
Utica National Insurance Company of Texas;
Utica National Insurance Company of Ohio;
Utica National Assurance Company;
Utica Lloyd's of Texas;
Utica Specialty Risk Insurance Company;
Founders Insurance Company;
Founders Insurance Company of Michigan;
Utica National Insurance Group;
State Farm Mutual Automobile Insurance Company;
The Hartford Financial Services Group, Inc.;
Travelers Insurance Group Holding, Inc.;
Travelers Property Casualty Corporation;
The Travelers Companies, Inc.;
Zurich North America;
Zurich Financial Services AG;
Zurich Insurance Group AG;
FedEx Corporation;
FedEx Express;
FedEx Ground;
FedEx Freight;
FedEx Office;
FedEx Custom Critical;
FedEx Trade Networks;
FedEx Supply Chain Solutions;
FedEx Services;
J.B. Hunt Transport Services, Inc.;
and U-Haul International,

Defendants.

**R<small>ELATOR</small> J. M<small>ICHAEL</small> H<small>AYES</small>' A<small>MENDED</small> C<small>OMPLAINT</small>**

# TABLE OF CONTENTS

I.  INTRODUCTION TO CASE ...................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................3

III.  PARTIES ............................................................................................................4

  A. Plaintiffs..........................................................................................................4

    i.  Relator...........................................................................................................4

    ii.  United States Government .............................................................5

  B. Defendants .......................................................................................................5

    i.  Liability Insurance Companies .........................................................6

      a.  Allstate Corporation and Allstate Insurance Company ...................................6

      b.  Zurich Insurance Group, AG, Zurich Financial Services, AIG, Farmers Insurance Group Companies, Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Farmers Underwriters Association, Foremost Insurance Group and Zurich North America ................................10

      d.  Berkshire Hathaway, Inc. and GEICO Insurance ........................................19

      e.  Maiden Holdings, Ltd. and GMAC Insurance.............................................23

      f.  Kemper Corporation and Kemper Independence Insurance Company ........27

      g.  Liberty Mutual Holding Company, Inc., Liberty Mutual Insurance Company, and Liberty Mutual Group............................................................31

      h.  Erie Insurance Group Erie Insurance Company of New York, Erie Insurance Company, Erie Insurance Exchange, Inc. and Erie Indemnity Company ....35

      i.  Metropolitan Property and Casualty Insurance, Metropolitan Group Property and Casualty Insurance Company................................................................40

      j.  Nationwide, Nationwide General Insurance Company, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Mutual Insurance Intercompany Pool....................44

      k.  Progressive Corporation, Progressive Insurance Company..........................50

      l.  Utica National Insurance Company, Republic-Franklin Insurance Company, Utica Mutual Insurance Company, Graphic Arts Mutual Insurance Company, Utica National Insurance Company of Texas, Utica National

ii

Insurance Company of Ohio, Utica National Assurance Company, Utica Lloyd's of Texas, Utica Specialty Risk Insurance Company, Founders Insurance Company, Founders Insurance Company of Michigan ................ 54

m. Prudential Financial, Inc., Prudential Insurance Company of America ....... 62

n. Travelers Property Casualty Corporation, Travelers Insurance Group Holding, Inc., The Travelers Companies, Inc. .............................................. 65

o. Other Liability Companies ........................................................................... 70

    i.   Daimler Chrysler Insurance Company ................................................. 70

    ii.  New York Central Mutual Fire Insurance Company ........................... 73

    iii. Preferred Mutual Insurance Company ................................................. 76

    iv.  State Farm Mutual Automobile Insurance Company .......................... 80

    v.   The Hartford Financial Services Group, Inc. ...................................... 83

ii. Trucking Companies ......................................................................................... 86

    a. FedEx Corporation, FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, FedEx Services ............................................................. 87

    b. Other Trucking Companies ........................................................................ 92

        i.   JB Hunt Transport Services, Inc. ..................................................... 92

        ii.  U-Haul International ......................................................................... 95

IV.   STATUTORY BACKGROUND ................................................................................. 98

      A. Medicare Secondary Payer Act .............................................................................. 98

V.    COLLATERAL ISSUE ................................................................................................... 103

VI.   RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD ................................................. 104

VII.  DEFENDANTS' FRAUDULENT AVOIDANCE OF REMITTING MONIES OWED TO MEDICARE UNDER THE MEDICARE SECONDARY PAYER ACT ................................. 107

      A. Triggering the Medicare Secondary Payer Act ...................................................... 107

      B. Evolution of the General Release ........................................................................... 110

         i.   General Release Used Through 2004 ............................................................. 110

         ii.  General Release Used 2005 – 2006 ............................................................... 111

      iii. General Release Used 2007 – 2010 ...................................................................112

      iv. General Release Used 2011 – 2012 ...................................................................113

**VIII. ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT** ..........114

    A. Applicable Law .......................................................................................................114

       i.   The False Claims Act......................................................................................114

    B. Defendants' Violation of the FCA ...........................................................................118

       i.   Defendants' Failure to Remit Monies Owed to Medicare under the Medicare
           Secondary Payer Act Violates the FCA former 31 U.S.C. §3729(a)(7); current
           31 U.S.C. §3729(a)(1)(G) .............................................................................118

**IX.   CAUSES OF ACTION** ...................................................................................................119

    A. COUNT I.- FALSE CLAIMS ACT – former 31 U.S.C. § 3729 (a)(7); current 31 U.S.C.
       § 3729(a)(1)(G) ......................................................................................................119

**X.     RELIEF** ...................................................................................................................120

**XI.   PRAYER** .................................................................................................................120

**XII.  JURY DEMAND** .......................................................................................................121

1.     Plaintiff/Relator J. Michael Hayes submits this Amended Complaint under 31 U.S.C. § 3729-3732 ("False Claims Act") on behalf of the United States of America, and his own behalf, to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and himself and would show the following:

## I.     INTRODUCTION TO CASE

2.     This suit concerns the Defendants' violations of the Federal False Claims Act at 31 U.S.C. §3729 *et seq*.  The Defendants are insurance companies and self-insured trucking companies that cover liability for themselves and their employees.  Since 2003, whenever these defendants settled liability claims with Medicare beneficiary claimants, they knowingly avoided and concealed their statutory obligations under the Medicare Secondary Payer Act at 42 U.S.C. §1395y *et seq*. to fully reimburse Medicare for the payments that the Medicare program had already made for these beneficiaries' for health care.

3.     Congress enacted the Medicare Secondary Payer Act in 1980, with subsequent amendments in 2003 and 2007 to ensure that Medicare was not paying for health care services and items to beneficiaries in situations wherein a primary payer was responsible for the payment of such claims.

4.     Under the Medicare Secondary Payer Act, the Defendants are classified as primary payers.  The Defendants are primary payers because they offer the insurance plans that, upon resolution of the personal injury claim, are responsible for payment of the health care services or items that were provided to a Medicare beneficiary for injuries suffered due to an accident or incident for which the settling Defendant (or its' client in the case of insurance companies) is responsible.  Medicare, under the Medicare Secondary Payer Act, is classified as a

secondary payer.  As the secondary payer, the payments Medicare makes for health care services and items on the Medicare beneficiary's behalf are considered conditional payments.  These are conditional payments because the primary payers under the Medicare Secondary Payer Act are obligated ultimately to pay these claims and are responsible to fully reimburse Medicare for these payments. [See §IV herein]

5.    It has been recognized that "CMS has had difficulty collecting payments particularly in small cases because attorneys and their clients do not always notify CMS of such payments."  As of 2011, there were no existing studies that had examined the magnitude of recovery possible under this repayment obligation.  It is estimated, however, that in automobile cases alone nationwide, the potential unrealized recovery to CMS/Medicare was in the range of $1 billion annually.  http://www.rand.org/content/dam/rand/pubs/occasional_papers/2011/RAND OP332.pdf; Rand Institute for Civil Justice, "Recovery Under the Medicare Secondary Payer Act", 2012.

6.    Although the Medicare statutory reimbursement obligations have been law since at least 1980 and reconfirmed statutorily in 2003, Defendants have knowingly and improperly avoided reimbursing to Medicare by ignoring their Medicare repayment obligations.  They have often and intentionally crafted general releases for settlements that are devoid of any reference to the Medicare provisions that require them to fully reimburse the federal health care program. When Defendants have created/accepted general releases for settlements that do reference Medicare, they include indemnification provisions in an attempt to shift/place the onus of reimbursement upon the Medicare beneficiary/claimant and the claimant's attorneys.  These indemnification provisions require that the claimants agree to indemnify the Defendants against claims made by Medicare for the reimbursement of its conditional payments. The Defendants

2

attempt to shift their non-delegable statutory responsibility to reimburse Medicare solely to the claimant. Though this device/technique is statutorily prohibited, that has not dissuaded nor prevented the Defendants from promoting and perpetuating the strategy. 42CFR 411.22(b) The effective result on these liability settlements from 2003-present is that the Defendants knowingly and improperly have avoided their statutory obligation to reimburse Medicare the conditional payments it made on behalf of a Medicare beneficiary under the Medicare Secondary Payer Act.

7.      Since 2003, the Defendants specifically, and the liability insurance industry generally, have knowingly avoided their statutory obligation to fully reimburse Medicare for its conditional payments made to its beneficiaries under the Medicare Secondary Payer Act. Through this industry and nationwide practice by liability insurance companies and self-insured companies to avoid their responsibility, the Defendants have knowingly caused the loss of hundreds of millions or even billions of dollars of reimbursement debts owed to the Medicare coffers.

## II.    JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by the Defendants, many of which occurred in the Western District New York and because the Defendants transact business within the Western District of New York.

9.      All the named Defendants engage in business in the State of New York and within the Western District of New York. Plaintiff Relator transacted all the business and the specific exampled documented herein through Defendants' corporate centers, business units, subsidiaries,

3

officers, directors, employees, and agents in the Western District of New York. All of the named

Defendants are subject to the general and specific personal jurisdiction of this Court pursuant to

31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United

States for multiple violations of 31 U.S.C. §3729.

10.    Whether or not there has been a statutorily relevant public disclosure of the

"allegations or transactions" alleged in this case under 31 U.S.C. §§3730(e), Relator qualifies

under that section of the False Claims Act as an "original source" of the allegations in this

Complaint. Relator has voluntarily provided the material information he possesses about

Defendants' violations of False Claims Act and the Medicare Secondary Payer rules to the

United States Government before filing this action. To the extent that there may have been a

public disclosure under 31 U.S.C. §3732(e)(4)(A), Relator possesses information that is totally

independent, detailed and specific as to "who, what, where and when" not available through any

other source and materially adds to any purportedly publicly disclosed allegations or

transactions.

### III.    PARTIES

### A. Plaintiffs

### i.    Relator

11.    Relator J. Michael Hayes is a citizen of the United States and a resident of the

state of New York. Relator, J. Michael Hayes, has been an attorney in the State of New York for

the last thirty-five years. Relator's practice primarily involves work in the liability insurance

field.   Through his practice of law, he encounters and deals with personal liability insurance

companies and self-insured companies on a daily basis.   As a professional in the liability

4

insurance field, Hayes has personal knowledge from conversations with defense counsel, insurance carrier representatives and other attorneys, of the Defendant insurance companies' company-wide and nationwide failure to notify Medicare of liability case resolutions and their failure to include adequate provisions in the general releases that ensure Medicare, as a secondary payer, receives full reimbursement of its health care expenditures and of the defendants, individually and collectively, failure to repay Medicare its owed conditional payments and the resultant debt to Medicare.

12.     Relator has written and published numerous articles, book chapters, and books and has lectured extensively over the last ten years on the issues of medical expense reimbursement.  That research and those publications have involved multiple areas of medical expense reimbursement including Medicare, Medicaid, ERISA, No Fault, Workers' Compensation and private health care providers.  Hayes has been consulted and retained on a national basis relative to medical reimbursement/lien/subrogation issues.

### ii. United States Government

13.     The United States government is the government plaintiff in this case.

### B. Defendants

14.     Two types of corporate insurance defendants are involved in this case - liability insurance companies and companies that are self-insured.  In general, liability is one's legal responsibility to pay for damages due to an accident or loss.  Liability insurance is any type of insurance policy offered by liability insurance companies that protects individuals or businesses from the risk that they may be sued or held legally liable for negligently causing injury or

damage to persons or property. Intentional damage and contractual liabilities are typically not covered in these types of policies.

### i. Liability Insurance Companies

#### a. Allstate Corporation

15.     Founded in 1931 as part of Sears, Roebuck and Company ("Sears"), Allstate Corporation (also known as Allstate, Esurance Insurance Company) became a totally independent company in 1995, after Sears divested its remaining stock to its shareholders. The Allstate Corporation, headquartered in Northbrook, Illinois, primarily operates through two principal subsidiaries, Allstate Insurance Company, a property-liability insurance company, and Allstate Life Insurance Company, a life and investment subsidiary. It is authorized to sell a variety of personal property and casualty insurance products in all fifty states and the District of Colombia. The Allstate Corporation is incorporated in the state of Delaware and may be served through its registered agent CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604.

16.     Allstate Insurance Company, also headquartered in Northbrook, Illinois, provides a variety of liability coverage including automobile, property and life insurance. Allstate Insurance Company is a wholly owned subsidiary of The Allstate Corporation. Allstate Insurance Company is incorporated in the state of Illinois and may be served through its registered agent CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

17.     Any and all acts alleged herein to have been committed by Defendant Allstate Insurance Company were committed by officers, directors, employees, representatives, or agents,

who at all times acted on behalf of the named defendants and within the course and scope of their employment.

18.     Any and all acts alleged herein to have been committed by Defendant Allstate Corporation were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

19.     Allstate Insurance Company and Allstate Corporation and the aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

20.     That Relator knows from personal transactions with Defendant Allstate Insurance Company as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant Allstate Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

21.     That Defendant Allstate Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

22.     That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

23.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

24.     That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

25.     Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit A, attached

General Releases involving: Adjuster: Rosemary Doeing, #2466102643; Adjuster: Ellen Gibson, #2465130678A13; Adjuster: Steve Peters, #NYA-0012313; Adjuster: Zuzzi, #3466001274; Adjuster: Todd Denall, #2466479272; #933204241; #057803413.

26.     That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

27.     Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

28.     That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds or thousands of different claimant's attorneys nationwide using the exact same scheme as outlined herein. Those amounts are readily

9

determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

29.     Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### b. Zurich Insurance Group, AG

30.     Zurich Insurance Group, AG (also known as Zurich Insurance, Zurich American Insurance Company, Zurich Financial Services Group, AIG National Insurance Company, Farmers Insurance Company, Farmers Group, Inc., Farmers Underwriters Exchange, Farm Family Casualty Insurance, Foremost Insurance Company) formerly known as Zurich Financial Services, AG is the parent company to several subsidiaries including, AIG, Farmers Insurance Group, Foremost Insurance Group, and Zurich North America.  Through its subsidiaries it offers numerous types of liability insurance.  It is headquartered in Zurich, Switzerland.  Zurich Financial Services is incorporated in the state of Nevada.  It may be served through its registered agent State Agent and Transfer Syndicate, Inc., 112 N. Curry Street, Carson City, Nevada 89703.

31.     Zurich North America or Zurich American Insurance Company is the North American branch of its Swiss parent company Zurich Insurance Group, AG.  Zurich North America offers liability insurance, which includes general liability, property and accident health

coverage. It is headquartered in Schaumberg, Illinois. Zurich North America is incorporated in the state of Illinois. It may be served through its registered agent Corporation Service Company, 2710 Gateway Oaks Dr., Suite 150N, Sacramento, California 95833.

32.     Farmers Insurance Group of Companies is a wholly owned subsidiary of Zurich Insurance Group, AG. It was incorporated in Nevada in 1927, is headquartered in Los Angeles, California, and includes the Farmers Group, Inc. and Farmers Insurance Exchange. It may be served through its registered agent John Defreece, 66 W. Springer Drive, Suite 211, Littleton, Colorado 80120.

33.     Farmers Insurance Exchange consists of three reciprocal or inter-insurance exchanges (as well as their subsidiaries and affiliates): Farmers Insurance Exchange, Truck Insurance Exchange (Truck Insurance Group), and Fire Insurance Exchange (Fire Insurance Group). A reciprocal insurance exchange is a form of an unincorporated insurance company owned by the policyholders (the subscribers) and managed by an attorney-in-fact. Farmers Insurance Exchange was organized under Section 1300 *et al.* of the California Insurance Code, which allows insureds to "exchange" policies with other insureds. Each new policy holder signs the Subscription Agreement included in each policy, thus becoming a subscriber or owner. The subscribers exchange their policies through the attorney-in-fact, allowing the subscribers to spread their risk. A Board of Governors oversees the reciprocal insurance and appoints the attorney-in-fact. The attorney-in-fact is a separate legal entity that runs the day-to-day affairs of the reciprocal insurance. The subscribers give the attorney-in-fact the legal authority to act on the subscribers' behalf in managing and administering the reciprocal insurance. The Farmers Insurance Exchange's original attorney-in-fact became the Farmers Group, Inc. Truck Insurance Exchange is incorporated in the state of California. It may be served through its registered agent

Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092. Fire Insurance Exchange is incorporated in the state of California. It may be served through its registered agent Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092.

34. As attorney-in-fact, the Farmers Group, Inc. facilitates the administration of the Farmers Insurance Exchange and carries out its insurance transactions, such as collecting premiums, paying losses, investing the Exchange's funds and commencing and defending actions for and against the Exchange. The Farmers Group, Inc. doing business as Farmers Underwriters Association performs these daily business activities. The Farmers Group, Inc. earns a fee that is derived as a percentage of the subscribers' premium dollar. Farmers Underwriters Association is incorporated in the state of California. It may be served through its registered agent Doren E. Hohl, 4680 Wilshire Blvd, Los Angeles, California 90010.

35. The Farmers Group, Inc. was a publicly traded stock company until 1988, when British American Tobaccos Industries, Plc. became the sole stockholder of the company. In 1998, Zurich Financial Services Group was created out of the merger of the financial services of British American Tobaccos Industries, Plc. In October 2000, Zurich Financial Services Group was restructured and newly incorporated as Zurich Financial Services. In April 2012, Zurich Financial Services Group changed its name to Zurich Insurance Group, AG. The Farmers Group, Inc. remains wholly owned by Zurich Insurance Group, AG. The Farmers Group, Inc. is incorporated in the state of Nevada. It may be served through its registered agent Doren E. Hohl, 4680 Wilshire Blvd., Los Angeles, California 90010.

36. The Farmers Insurance Exchange is comprised of numerous member companies. The member companies have management service agreements in place with The Farmers

12

Insurance Exchange. Through these agreements The Farmers Insurance Exchange provides management services and claims adjusting. The Farmers Insurance Exchange is incorporated in the state of California. It may be served through its registered agent Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092.

37. Foremost Insurance Group, headquartered in Caledonia, Michigan, provides coverage for specialty products such as motorcycle, mobile homes and property. Foremost Insurance Group was acquired by Farmers Insurance Group in March 2000, and became its wholly-owned subsidiary. Foremost Insurance Group is incorporated in the state of Michigan. It may be served through its registered agent Corporation Service Company, 1111 E. Main Street, 16th Floor, Richmond, Virginia 23219.

38. AIG, located in New York City, New York, is a liability insurance company that offers a variety of coverage including accident, health and automobile insurance. AIG was acquired by Farmers Insurance Group in 2009 and became its wholly-owned subsidiary. AIG is incorporated in the state of Delaware and may be served through its registered agent Corporation Service Company, 80 State St., Albany, New York 12207.

39. Any and all acts alleged herein to have been committed by Defendant Zurich Insurance Group, AG were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

40. Any and all acts alleged herein to have been committed by Defendant Zurich Financial Services (also known as Zurich Financial Services, AG) were committed by officers,

13

directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

41.     Any and all acts alleged herein to have been committed by Defendant Zurich North America were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

42.     Any and all acts alleged herein to have been committed by Defendant Farmers Insurance Group were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

43.     Any and all acts alleged herein to have been committed by Defendant Farmers Insurance Exchange were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

44.     Any and all acts alleged herein to have been committed by Defendant Truck Insurance Group were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

45.     Any and all acts alleged herein to have been committed by Defendant Fire Insurance Group were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

14

46.    Any and all acts alleged herein to have been committed by Defendant Farmers Underwriters Exchange were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

47.    Any and all acts alleged herein to have been committed by Defendant Foremost Insurance Group were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

48.    Any and all acts alleged herein to have been committed by Defendant AIG were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

49.    Zurich Insurance Group, AG, Zurich Financial Services, Zurich North America, Farmers Insurance Groups, Foremost Insurance Group and AIG and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

50.    That Relator knows from personal transactions with Defendants Zurich Insurance Group, AG, Zurich Financial Services, Zurich North America, Farmers Insurance Groups, Foremost Insurance Group, AIG, their subsidiaries as well as other liability carriers, and in dealing and negotiating with them and their agents, adjustors and attorneys and from other

experiences as set forth hereinafter, that Defendant Zurich Insurance Group, AG, Zurich Financial Services, Zurich North America, Farmers Insurance Groups, Foremost Insurance Group and AIG in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

51.    That Defendants Zurich Insurance Group, AG, Zurich Financial Services, Zurich North America, Farmers Insurance Groups, Foremost Insurance Group, AIG, and their subsidiaries by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

52.    That by accepting the general releases and paying the consideration agreed to therein, said Defendants established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

53.    That said Defendants did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

54. That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures. That debt and those monies are still due and owing Medicare/CMS.

55. Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit B, attached General Releases involving: Adjuster: Patrick Manning, #31105c1124-080604; Brendan at 1(800) 527-3907 x44939, Robert Orman Defendant; Adjuster: Lisa Noonan, #1005559212-1-2; Adjuster: Phyllis Hanesworth, #007-00119158-pl; Adjuster: Margaret Southerland, #5440039348-001.

56. That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

57.     Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

58.     That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

59.     Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

18

### c. Berkshire Hathaway, Inc.

60.     GEICO Insurance (also known as GEICO Insurance Company, GEICO) is the third largest private passenger auto insurer in the United States. It is headquartered at One GEICO Plaza, Washington, D.C. It is a wholly-owned subsidiary of Berkshire Hathaway, Inc. GEICO Insurance is incorporated in the state of Nebraska. It may be served through its registered agent CT Corporation System, 1024 K Street, Lincoln, Nebraska 68508.

61.     Berkshire Hathaway, Inc. is a holding company headquartered in Omaha, Nebraska that owns numerous subsidiaries in a diverse group of businesses, including, but not limited to, insurance, freight rail transportation, finance and marketing. Berkshire Hathaway, Inc. is incorporated in the state of Delaware. It may be served through its registered agent Forrest N. Krutter, 3555 Farnam Street, Suite 1440, Omaha, Nebraska 68131.

62.     Any and all acts alleged herein to have been committed by Defendant GEICO Insurance were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

63.     Any and all acts alleged herein to have been committed by Defendant Berkshire Hathaway, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

64.     GEICO Insurance and Berkshire Hathaway, Inc. are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing

relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

65.     That Relator knows from personal transactions with Defendants GEICO Insurance and Berkshire Hathaway, Inc. as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant GEICO Insurance and Berkshire Hathaway, Inc. in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

66.     That Defendants GEICO Insurance and Berkshire Hathaway, Inc., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

67.     That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

68.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all

20

subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

69.     That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

70.     Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit C, attached General Releases involving: Adjuster: Judy Dickerson, #029-448300-0101-025; #254-21573-0101-018; Adjuster: Brandon Martin, #027-420524-0101-026; Adjuster: Michelle Farrell, #013-742627-0101-085; #030-385406-0101-015; Adjuster: Susan Huse, #025-421573-0101-018; Adjuster: Sean McEnroe, #031-054079-0101-018; Adjuster: Dan Gaus, #034-846878-0101-010; Adjuster: Brian Gincel, #027-950484-0101-021.

71.     That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure

21

to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

72.     Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

73.     That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

74.     Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific

22

examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### d. Maiden Holdings, Inc.

75.    GMAC Insurance (also known as GMAC Insurance Company, GMAC) provides a variety of liability coverage, including automobile and property. GMAC Insurance is headquartered in Winston-Salem, North Carolina. GMAC Insurance is incorporated in the state of Montana. It may be served through its registered agent Corporation Service Company, 211 East 7th St., Suite 620, Austin, Texas 78701.

76.    Maiden Holdings Ltd acquired GMAC Insurance in 2010. Maiden Holdings, Ltd. is headquartered in Hamilton, Bermuda.

77.    Any and all acts alleged herein to have been committed by Defendant GMAC Insurance were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

78.    Any and all acts alleged herein to have been committed by Defendant Maiden Holding, Ltd. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

79.    GMAC Insurance and Maiden Holdings, Ltd. and the aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past,

present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

80.     That Relator knows from personal transactions with Defendants GMAC Insurance and Maiden Holdings, Ltd. as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants GMAC Insurance and Maiden Holding, Ltd. in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

81.     That Defendants GMAC Insurance and Maiden Holding, Ltd., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

82.     That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

83.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all

24

subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

84.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures. That debt and those monies are still due and owing Medicare/CMS.

85.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit D, attached General Releases involving: Adjuster: Julia Gill, #7377522, #1154843; Adjuster: Beth Oliveri #1268985; Adjuster: Gil Sainz, #3400132.

86.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples

attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

87. Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

88. That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

89. Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

26

### e. Kemper Corporation

90.     Kemper Independence Insurance Company (also known as Kemper Insurance Company, Kemper Home & Life), headquartered in Jacksonville, Florida, provides a variety of liability coverage including automobile, property and life insurance. It is incorporated in the state of Illinois and may be served through its registered agent CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

91.     Kemper Independence Insurance Company is part of the Kemper Corporation. Kemper Corporation is headquartered in Chicago, Illinois. Kemper Corporation is a diversified insurance company with subsidiaries that provide life, health, auto, homeowners, rental and other insurance products to individuals and small businesses. It is incorporated in the state of Delaware and may be served through its registered agent CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604.

92.     Any and all acts alleged herein to have been committed by Defendant Kemper Independence Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

93.     Any and all acts alleged herein to have been committed by Defendant Kemper Corporation were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

94.     Kemper Independence Insurance Company and Kemper Corporation and the aforementioned subsidiaries are related entities/individuals sharing common employees, offices,

and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

95.     That Relator knows from personal transactions with Defendants Kemper Independence Insurance Company and Kemper Corporation as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Kemper Independence Insurance Company and Kemper Corporation in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

96.     That Defendants Kemper Independence Insurance Company and Kemper Corporation, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

97.     That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

28

98.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

99.     That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures. That debt and those monies are still due and owing Medicare/CMS.

100.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit E, attached General Release involving: Adjuster: Stephen Ruthig, #331 AZ 520357.

101.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples

29

attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

102. Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

103. That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

104. Relator, through his experience, contact with other Plaintiff and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments, but was also employed generally and throughout the industry, by all the Defendants herein.

### f. Liberty Mutual Holding Company, Inc.

105.    Liberty Mutual Holding Company, Inc. (also known as Liberty Mutual, Liberty Mutual Group, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company, Liberty Insurance Company) markets and underwrites insurance policies.  Liberty Mutual has four business units: personal markets, commercial markets, agency markets and Liberty International.  It operates through its subsidiaries in these four business units.  Liberty Mutual Insurance Company also referred to as Liberty Mutual Group comprises the personal markets unit and offers private passenger automobile insurance, homeowners insurance and general liability insurance.  Liberty Mutual Holding Company, Inc. and its subsidiaries are headquartered in Boston, Massachusetts.

106.    Liberty Mutual Holding Company, Inc. and Liberty Insurance Company are incorporated in the state of Massachusetts and may be served through the registered agent Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas  78701.

107.    Any and all acts alleged herein to have been committed by Defendant Liberty Mutual Holding Company, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

108.    Any and all acts alleged herein to have been committed by Defendant Liberty Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

109. Liberty Mutual Holding Company, Inc. and Liberty Insurance Company and the aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

110. That Relator knows from personal transactions with Defendants Liberty Mutual Holding Company, Inc. and Liberty Insurance Company as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Liberty Mutual Holding Company, Inc. and Liberty Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

111. That Defendants Liberty Mutual Holding Company, Inc. and Liberty Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

112. That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing

CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

113.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

114.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

115.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier.  See Exhibit F, attached General Releases involving: Adjuster: Chip Spinks, #711162901; #LA 274-3122, #44X09560C-AB; Adjuster: Mark Malone, #LA 275-010189650-01; Adjuster: Ryan Brundin, #1031500550; Adjuster: Jim Collins, #LA 275-007688516-02;

116.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant

Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

117.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

118.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

119.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and

34

national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

       **g.**    **Erie Insurance Group**

120.    Erie Insurance Company of New York (also known as Erie Insurance Company, Erie and Niagara Insurance Association, Erie Insurance Group, Erie Insurance Property and Casualty Company), located in Rochester, New York, is an insurance company that offers property, automobile and life insurance. Prior to December, 2010 when it was acquired by Erie Insurance Exchange, Inc., Erie Insurance Company of New York was a subsidiary of Erie Indemnity Company. It is incorporated in the state of New York and may be served through its registered agent James E. Weaver, Colonnade Corporate Center, 2820 Electric Rd., Suite 100, Roanoke, Virginia 24018.

121.    Erie Insurance Company is an insurance company that offers a variety of coverage including fire, property and automobile insurance. Until December 2010, it operated as a subsidiary of Erie Indemnity Company. It is now a subsidiary of Erie Insurance Exchange, Inc. Erie Insurance Company is headquartered in Erie, Pennsylvania. It is incorporated in the state of Pennsylvania and may be served through its registered agent James E. Weaver, Colonnade Corporate Center, 2820 Electric Rd., Suite 100, Roanoke, Virginia 24018

122.    Erie Insurance Exchange, Inc. is a reciprocal insurer established in 1925. The Erie Indemnity Company provides management services for Erie Insurance Exchange, Inc. Erie Insurance Exchange, Inc. is incorporated in the state of Pennsylvania. It may be served through

its registered agent James E. Weaver, Colonnade Corporate Center, 2820 Electric Rd., Suite 100, Roanoke, Virginia 24018.

123.    Erie Indemnity Company operated as a property and casualty insurer through its three wholly owned subsidiaries – Erie Insurance Company of New York, Erie Insurance Company and Erie Insurance Property and Casualty Company until December 2010. It sold the three subsidiaries to Erie Insurance Exchange, Inc. at that time. It continues to function as the management company for the Erie Insurance Exchange, Inc. Erie Indemnity Company is incorporated in the state of Pennsylvania. It may be served through its registered agent James E. Weaver, Colonnade Corporate Center, 2820 Electric Rd., Suite 100, Roanoke, Virginia 24018.

124.    Erie Insurance Company, Erie Insurance Exchange, Inc., and Erie Indemnity Company are all located in Erie, Pennsylvania.

125.    Any and all acts alleged herein to have been committed by Defendant Erie Insurance Company of New York were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

126.    Any and all acts alleged herein to have been committed by Defendant Erie Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

127.    Any and all acts alleged herein to have been committed by Defendant Erie Insurance Exchange were committed by officers, directors, employees, representatives, or

36

agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

128.   Any and all acts alleged herein to have been committed by Defendant Eire Indemnity Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

129.   Erie Insurance Company of New York, Erie Insurance Company, Erie Insurance Exchange Inc., Erie Indemnity Company and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

130.   Collectively, Erie Insurance Company of New York, Erie Insurance Company, Erie Insurance Exchange, Inc. and Erie Indemnity Company operate collectively as the Erie Insurance Group.

131.   That Relator knows from personal transactions with Defendant Erie Insurance Group as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant Erie Insurance Group in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical

expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

132.   That Defendant Erie Insurance Group, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

133.   That by accepting the general releases and paying the consideration agreed to therein, said Defendant established that a debt of past medical payments that was due and owing CMS but, in accordance with the scheme as set forth herein, knowingly avoided and refused to repay Medicare to satisfy the debt.

134.   That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

135.   That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

136.   Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained

38

in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit G, attached General Releases involving: Adjuster: Patrick A. Bray, #010930084262; Adjuster: Christopher McDermott, #010930076559, Attorney Jeffrey Baase; Adjuster: Kathy K, #9L68522; Adjuster: Tonya Daniels, #010930068192.

137.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

138.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

139.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical

39

expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

140.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### h. Metropolitan Property and Casualty Insurance

141.    Metropolitan Group Property and Casualty Insurance Company (also known as MetLife Auto & Home Insurance Company, Metropolitan Casualty Insurance Company, MetLife Insurance Company, Metropolitan Property & Casualty Insurance Company, METLIFE), headquartered in Warwick, Rhode Island, provides a variety of liability insurance coverage such as homeowners, automobile and life insurance. It is a subsidiary of Metropolitan Property and Casualty Insurance.    Metropolitan Group Property and Casualty Insurance Company is incorporated in the state of Rhode Island. It may be served through its registered agent CT Corporation System, 818 W. Seventh St., Los Angeles, California 90017.

142.    Metropolitan Property and Casualty Insurance, more commonly referred to as MetLife and headquartered in Warwick, Rhode Island, is a leading insurance company in the

United States.  Through its subsidiaries, it offers a variety of insurance coverage including home, and automobile.  Metropolitan Property and Casualty Insurance Company is incorporated in the state of Rhode Island.  It may be served through its registered agent CT Corporation System, 818 W. Seventh St., Los Angeles, California 90017.

143.    Any and all acts alleged herein to have been committed by Defendant Metropolitan Group Property and Casualty Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

144.    Any and all acts alleged herein to have been committed by Defendant Metropolitan Property and Casualty Insurance were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

145.    Metropolitan Group Property and Casualty Insurance Company, Metropolitan Property and Casualty Insurance and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

146.    That Relator knows from personal transactions with Defendant Metropolitan Property and Casualty Insurance Company as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set

forth hereinafter, that Defendant Metropolitan Property and Casualty Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

147.    That Defendant Metropolitan Property and Casualty Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

148.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

149.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures. That debt and those monies are still due and owing Medicare/CMS.

150.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with

42

Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit H, attached General Releases involving: Adjuster: Kim Hahn, #ALD1716JC; Adjuster: Terry Pemperton, #ALB79831CZ; Adjuster: Kerry Levitt, #ACL56767; Adjuster: Ron Boyce, #ACL42837CU.

151.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.  This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein.)

152.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.  That money is still due and owing and that debt remains undischarged.

153.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical

43

expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

154.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### i.   Nationwide

155.    Nationwide General Insurance Company (also known as Nationwide, Nationwide Insurance Company) offers property and casualty insurance services.  It is a subsidiary of Nationwide Financial Services, Inc.  Nationwide General Insurance Company is incorporated in the state of Ohio.  It may be served through its registered agent CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

156.    Nationwide Financial Services, Inc. through its subsidiaries provides long-term savings and retirement products.  It is a subsidiary of Nationwide Corporation.  Nationwide Financial Services, Inc. is incorporated in the state of Delaware.  It may be served through its registered agent W. Sidney Druen, One Nationwide Plaza, Columbus, Ohio 43216.

157. Nationwide Corporation is a holding company that offers property and casualty insurance through its subsidiaries. It is a subsidiary of Nationwide Mutual Insurance Company. Nationwide Corporation is incorporated in the state of Ohio. It may be served through its registered agent CT Corporation System, 1300 E. Ninth Street, Cleveland, Ohio 44114.

158. Nationwide Mutual Insurance Company offer insurance and financial services through its subsidiaries, including automobile, homeowners and life insurance. It is a subsidiary of Nationwide Mutual Insurance Intercompany Pool. Nationwide Mutual Insurance Company is incorporated in the state of Ohio. It may be served through its registered agent CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

159. Nationwide Mutual Insurance Intercompany Pool is located in Columbus, Ohio. It is a subsidiary of Nationwide. Nationwide Mutual Insurance Intercompany Pool is incorporated in the state of Ohio. It may be served through its registered agent CT Corporation System, 1300 E. Ninth Street, Cleveland, Ohio 44114.

160. Nationwide is the parent company of the above mentioned Nationwide entities. Through its subsidiaries, mentioned above, it provides insurance and financial services such as automobile, property and life insurance. Nationwide and its subsidiaries are located in Columbus, Ohio. Nationwide is incorporated in the state of Ohio. It may be served through its registered agent CT Corporation System, 1300 E. Ninth Street, Cleveland, Ohio 44114.

161. Any and all acts alleged herein to have been committed by Defendant Nationwide General Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

45

162. Any and all acts alleged herein to have been committed by Defendant Nationwide Financial Services, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

163. Any and all acts alleged herein to have been committed by Defendant Nationwide Corporation were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

164. Any and all acts alleged herein to have been committed by Defendant Nationwide Mutual Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

165. Any and all acts alleged herein to have been committed by Defendant Nationwide Mutual Insurance Intercompany Pool were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

166. Any and all acts alleged herein to have been committed by Defendant Nationwide were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

167. Nationwide General Insurance Company, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Mutual Insurance Intercompany Pool, Nationwide and their aforementioned subsidiaries are related

46

entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

168. That Relator knows from personal transactions with Defendants Nationwide General Insurance Company, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Mutual Insurance Intercompany Pool and Nationwide as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Nationwide General Insurance Company, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Mutual Insurance Intercompany Pool and Nationwide in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

169. That Defendants Nationwide General Insurance Company, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Mutual Insurance Intercompany Pool and Nationwide, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

170.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

171.     That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

172.     Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit I, attached General Releases involving: Adjuster: Martha VanTassel, #6631P896293 1130100601; John Arend Defendant; Adjuster: Tom Andino, Bill Cole and Jerry Whalen; Adjuster: Deborah Neal, #6631B8570220802200201.

173.     That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure

to repay Medicare to the claimant and his attorney.  This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

174.   Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)],  Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.  That money is still due and owing and that debt remains undischarged.

175.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

176.   Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific

examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### j.  Progressive Corporation

177.    Progressive Insurance Company (also known as Progressive) is an insurance company that offers coverage for automobile, home and health insurance.  It is a subsidiary of The Progressive Corporation. Progressive Insurance Company is incorporated in the state of Ohio.  It may be served through its registered agent CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

178.    The Progressive Corporation is a company that offers a variety of insurance coverage through its numerous subsidiaries.  The Progressive Corporation and the Progressive Insurance Company are headquartered in Mayfield Village, Ohio.  The Progressive Corporation is incorporated in the state of Ohio.   It may be served through its registered agent CT Corporation System, 1300 Ninth St., Cleveland, Ohio 44114.

179.    Any and all acts alleged herein to have been committed by Defendant Progressive Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

180.    Any and all acts alleged herein to have been committed by Defendant The Progressive Corporation were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

181.    Progressive Insurance Company, The Progressive Corporation and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

182.    That Relator knows from personal transactions with Defendants Progressive Insurance Company and The Progressive Corporation as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Progressive Insurance Company and The Progressive Corporation in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

183.    That Defendants Progressive Insurance Company and The Progressive Corporation, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

184.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters,

agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

185.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

186.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit J, attached General Releases involving: Adjuster: Grant Reed, #069647103; Adjuster Mark Marrano, #056046189; Adjuster: Dennis Coseo, #057184335; $056958219-02.

187.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.   This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

188.   Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.  That money is still due and owing and that debt remains undischarged.

189.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

190.   Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### k. Utica National Insurance Company

191.     Republic-Franklin Insurance Company, located in Columbus, Ohio, is an insurance company that offers coverage such as automobile and property insurance. It is a company that operates under the trade name Utica National Insurance Group and is also known as Utica Mutual Insurance Company, Utica National Insurance Company, Utica First, Graphic Arts Mutual Insurance Company, Utica National Insurance Group.

192.     Utica National Insurance Group does not issue insurance policies, instead the ten companies that do business under the Utica National Insurance Group issue the insurance policies. Those ten companies include: the Republic-Franklin Insurance Company; Utica Mutual Insurance Company; Graphic Arts Mutual Insurance Company; Utica National Insurance Company of Texas; Utica National Insurance Company of Ohio; Utica National Assurance Company; Utica Lloyd's of Texas; Utica Specialty Risk Insurance Company; Founders Insurance Company, and Founders Insurance Company of Michigan. The terms "Utica National Insurance Group," "Utica National," and "Utica" all refer to the above mentioned member companies.

193.     The Republic-Franklin Insurance Company is incorporated in the state of Ohio. It may be served through its registered agent Keith W. Jones, 2500 Corporate Exchange, Columbus, Ohio 43229.

194.     Utica Mutual Insurance Company is incorporated in the state of New York. It may be served through its registered agent Matthew Lupino, 1100 Boulders Parkway, Suite 300, Richmond, Virginia 23225.

195.    Graphic Arts Mutual Insurance Company is incorporated in the state of New York.  It may be served through its registered agent Thomas Moore 1120 Queen City Avenue, Tuscaloosa, Alabama 35403.

196.    Utica National Insurance Company of Texas is incorporated in the state of Texas. It may be served through its registered agent David Cunningham, 2435 North Central Expressway, Suite 400, Richardson, Texas 75080.

197.    Utica National Insurance Company of Ohio is incorporated in the state of Ohio.  It may be served through its registered agent Brian Lytwynec, 180 Genesee Street, New Hartford, New York 13413.

198.    Utica National Assurance Company is incorporated in the state of New York.  It may be served through its registered agent CT Corporation System, 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060.

199.    Utica Lloyd's of Texas is incorporated in the state of Texas.  It may be served through its registered agent David Cunningham, 2435 North Central Expressway, Suite 400, Richardson, Texas 75080.

200.    Utica Specialty Risk Company is incorporated in the state of Texas.  It may be served through its registered agent David Cunningham, 2435 North Central Expressway, Suite 400, Richardson, Texas 75080.

201.    Founders Insurance Company is incorporated in the state of Illinois.  It may be served through its registered agent Corporation Service Company, 1111 East Main St., 16th Floor, Richmond, Virginia 23219.

202.    Founders Insurance Company of Michigan is incorporated in the state of Michigan. It may be served through its registered agent Jane Abed, 1645 E. Birchwood Avenue, Des Plaines, Illinois 60018.

203.    Utica National Insurance Group is incorporated in the state of New York. It may be served through its registered agent Brian Lytwynec, 180 Genesee Street, New Hartford, New York 13413.

204.    Any and all acts alleged herein to have been committed by Defendant Republic-Franklin Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

205.    Any and all acts alleged herein to have been committed by Defendant Utica Mutual Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

206.    Any and all acts alleged herein to have been committed by Defendant Graphic Arts Mutual Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

207.    Any and all acts alleged herein to have been committed by Defendant Utica National Insurance Company of Texas were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

56

208.    Any and all acts alleged herein to have been committed by Defendant Utica National Insurance Company of Ohio were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

209.    Any and all acts alleged herein to have been committed by Defendant Utica National Assurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

210.    Any and all acts alleged herein to have been committed by Defendant Utica Lloyd's of Texas were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

211.    Any and all acts alleged herein to have been committed by Defendant Utica Specialty Risk Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

212.    Any and all acts alleged herein to have been committed by Defendant Founders Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

213.    Any and all acts alleged herein to have been committed by Defendant Founders Insurance Company of Michigan were committed by officers, directors, employees,

representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

214.   Any and all acts alleged herein to have been committed by Defendant Utica National Insurance Group were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

215.   Republic-Franklin Insurance Company; Utica Mutual Insurance Company; Graphic Arts Mutual Insurance Company; Utica National Insurance Company of Texas; Utica National Insurance Company of Ohio; Utica National Assurance Company; Utica Lloyd's of Texas; Utica Specialty Risk Insurance Company; Founders Insurance Company; Founders Insurance Company of Michigan, Utica National Insurance Group and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

216.   That Relator knows from personal transactions with Defendants Republic-Franklin Insurance Company; Utica Mutual Insurance Company; Graphic Arts Mutual Insurance Company; Utica National Insurance Company of Texas; Utica National Insurance Company of Ohio; Utica National Assurance Company; Utica Lloyd's of Texas; Utica Specialty Risk Insurance Company; Founders Insurance Company; Founders Insurance Company of Michigan, and Utica National Insurance Group as well as other liability carriers, and in dealing and

negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Republic-Franklin Insurance Company; Utica Mutual Insurance Company; Graphic Arts Mutual Insurance Company; Utica National Insurance Company of Texas; Utica National Insurance Company of Ohio; Utica National Assurance Company; Utica Lloyd's of Texas; Utica Specialty Risk Insurance Company; Founders Insurance Company; Founders Insurance Company of Michigan, and Utica National Insurance Group in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

217.    That Defendants Republic-Franklin Insurance Company; Utica Mutual Insurance Company; Graphic Arts Mutual Insurance Company; Utica National Insurance Company of Texas; Utica National Insurance Company of Ohio; Utica National Assurance Company; Utica Lloyd's of Texas; Utica Specialty Risk Insurance Company; Founders Insurance Company; Founders Insurance Company of Michigan, and Utica National Insurance Group, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

218.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters,

agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

219.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

220.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit K, attached General Releases involving: Adjuster: William Harmon, #115843; Adjuster:  Scott Holler, #1161465; Adjuster: Mark Nowak, #1157989; Adjuster: Todd Chmielewski, #26385.

221.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.  This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

222.   Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

223.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

224.   Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

61

l. **Prudential Financial, Inc.**

225. The Prudential Insurance Company of America (also known as Prudential Insurance Company, Prudential Property & Casualty) provides life insurance and retirement services. The Prudential Insurance Company of America is incorporated in the state of New Jersey. It may be served through its registered agent CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201. The Prudential Insurance Company is a wholly owned subsidiary of Prudential Financial, Inc. The Prudential Insurance Company of America and Prudential Financial, Inc. are headquartered in Newark, New Jersey.

226. Prudential Financial, Inc. is one of the largest financial institutions in the world offering a variety of services, including life insurance, retirement and investments services. Prudential Financial, Inc. is incorporated in the state of New Jersey. It may be served through its registered agent Kathleen Gibson, 751 Broad St., Newark, New Jersey 07102.

227. Any and all acts alleged herein to have been committed by Defendant The Prudential Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

228. Any and all acts alleged herein to have been committed by Defendant Prudential Financial Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

229. The Prudential Insurance Company, Prudential Financial Inc. and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices,

and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

230. That Relator knows from personal transactions with Defendants The Prudential Insurance Company and Prudential Financial Inc. as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants The Prudential Insurance Company and Prudential Financial Inc. in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

231. That Defendants The Prudential Insurance Company and Prudential Financial Inc., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

232. That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

233.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

234.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier.   See Exhibit L, attached General Releases involving: Adjuster: Stephen DePillo, #44W07371; Adjuster: Robin Hanna, #44X08267-C-08-096.

235.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.   This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

236.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement

64

[42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)],  Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.  That money is still due and owing and that debt remains undischarged.

237.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

238.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### m. Travelers Property Casualty Corporation

239.    Travelers Insurance Group Holding, Inc. (also known as Travelers Insurance Company, Travelers Property Casualty Company of America, St. Paul Travelers Insruance Company), located in Hartford, Connecticut is an insurance company that offers property,

liability, automobile and homeowner's coverage.  It is a subsidiary of Travelers Property Casualty Corporation. Travelers Insurance Group Holding, Inc. is incorporated in the state of Delaware.  It may be served through its registered agent Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120.

240.  Travelers Property Casualty Corporation is a fire and casualty insurance company.  It is located in Hartford, Connecticut and is a subsidiary of The Travelers Company Inc.  Travelers Property Casualty Corporation is incorporated in the state of Connecticut.  It may be served through its registered agent Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120.

241.  The Travelers Companies, Inc. through its subsidiaries offers property casualty insurance for home, automobile and business.  It is located in New York City, New York and incorporated in the state of Minnesota.

242.  Travelers Insurance Group Holding, Inc., Travelers Property Casualty Corporation and The Travelers Companies, Inc. may be served through the registered agent Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120.

243.  Any and all acts alleged herein to have been committed by Defendant Travelers Insurance Group Holdings Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

244.  Any and all acts alleged herein to have been committed by Defendant Travelers Property Casualty Group Corporation were committed by officers, directors, employees,

representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

245.    Any and all acts alleged herein to have been committed by Defendant Travelers Companies, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

246.    Travelers Insurance Group Holdings, Inc., Travelers Property Casualty Corporation, The Travelers Companies, Inc. and their aforementioned subsidiaries are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

247.    That Relator knows from personal transactions with Defendants Travelers Insurance Group Holdings, Inc., Travelers Property Casualty Corporation and The Travelers Companies, Inc. as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants Travelers Insurance Group Holdings, Inc., Travelers Property Casualty Corporation and The Travelers Companies, Inc. in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation,

medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

248.   That Defendants Travelers Insurance Group Holdings, Inc., Travelers Property Casualty Corporation and The Travelers Companies, Inc., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

249.   That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

250.   That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

251.   Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit M, attached

General Releases involving: Adjuster: Lee Parker, #611PPLAV9447T; Adjuster: Brian, #L8I5577; Adjuster: Bob Tollor, #ACL3953.

252.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.  This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

253.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)],  Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.  That money is still due and owing and that debt remains undischarged.

254.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants

by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

255.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### n.  Other Liability Insurance Companies

### i.  Daimler Chrysler Insurance Company

256.    Daimler Chrysler Insurance Company offers fire, marine property and casualty insurance.  Prior to January, 2009, the company was named Corepointe Insurance Company. The company changed its name again in March, 2011, to Daimler Chrysler Insurance Company. It is located in Bingham Farms, Michigan.  Daimler Chrysler Insurance Company is incorporated in the state of Michigan.  It may be served through its registered agent CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

257.    Any and all acts alleged herein to have been committed by Defendant Daimler Chrysler Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

258.    That Relator knows from personal transactions with Defendant Daimler Chrysler Insurance Company any as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant Daimler Chrysler Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

259.    That Defendant Daimler Chrysler Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

260.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

261.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor

71

reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

262.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit N, attached General Release involving: Adjuster: Holly Harmon and "Kitty", #038028657.

263.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.  This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

264.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)],  Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of

all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

265.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

266.   Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### ii. New York Central Mutual Fire Insurance Company

267.   New York Central Mutual Fire Insurance Company (also known as New York Central Mutual Insurance Company) is an insurance company offering property and casualty coverage including automobile, homeowners and fire insurance.   It is headquartered in Edmeston, New York.  New York Central Mutual Fire Insurance Company is incorporated in the state of New York.  It may be served through its registered agent Vanness D. Robinson, II, 1899 Central Plaza East, Edmeston, New York 13335.

268.     Any and all acts alleged herein to have been committed by Defendant New York Central Mutual Fire Insurance Company and their aforementioned subsidiaries were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

269.     That Relator knows from personal transactions with Defendant New York Central Mutual Fire Insurance Company as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant New York Central Mutual Fire Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

270.     That Defendant New York Central Mutual Fire Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

271.     That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

272.     That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

273.     Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier.   See Exhibit O, attached General Releases involving: #2006610638-0; #2009631173-0; Adjuster: Carolyn, #2006008024; Adjuster: Julie Smith, #2007622970-0; 2007-401484.

274.     That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.   This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

275.     Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement

[42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

276. That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

277. Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### iii. Preferred Mutual Insurance Company

278. Preferred Mutual Insurance Company is an insurance company that provides coverage which includes personal injury liability, property damage and automobile insurance. It is located in New Berlin, New York. Preferred Mutual Insurance Company is incorporated in

76

the state of New York. It may be served through its registered agent Christopher P. Taft, One Preferred Way, New Berlin, New York 13411.

279.    Any and all acts alleged herein to have been committed by Defendant Preferred Mutual Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

280.    That Relator knows from personal transactions with Defendant Preferred Mutual Insurance Company as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant Preferred Mutual Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

281.    That Defendant Preferred Mutual Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

282.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters,

agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

283.   That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.   That debt and those monies are still due and owing Medicare/CMS.

284.   Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit P, attached General Releases involving: Adjuster, Sean Campbell, #05-003663 SPC; Adjuster: Sean Campbell, #04014966MDS.

285.   That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

286.   Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

287.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

288.   Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

79

### iv. State Farm Mutual Automobile Insurance Company

289.    State Farm Mutual Automobile Insurance Company (also known as State Farm Insurance Company, State Farm, State Farm Insurance Companies), commonly referred to as State Farm Insurance offers a variety of insurance coverage including home, automobile and life insurance.   It is headquartered in Bloomington, Illinois.   State Farm Mutual Automobile Insurance Company is incorporated in the state of Illinois.   It may be served through its registered agent Margie Southard, 8900 Amberglen Blvd., Austin, Texas 78729.

290.    Any and all acts alleged herein to have been committed by Defendant State Farm Mutual Automobile Insurance Company were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

291.    That Relator knows from personal transactions with Defendant State Farm Mutual Automobile Insurance Company and its aforementioned subsidiaries as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant State Farm Mutual Automobile Insurance Company in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

292.    That Defendant State Farm Mutual Automobile Insurance Company, by accepting the "general release" which included medical expense claims, was accepting liability

[42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

293.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

294.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.    That debt and those monies are still due and owing Medicare/CMS.

295.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit Q, attached General Releases involving: Adjuster: Ned, #52-29043-390; Adjuster: Patrick Perry, #52-2740-651, #52-2922-154; Adjuster: Jessica Walter, $52-8244-887; Adjuster: Patrick Shannon, #32V578285; Adjuster: Krista Robbins, #52-2901-720; Adjuster: Tim Hardie, #52-2915-499; Adjuster: Miles Webster and Mark Fernstein, #52-0164-945.

296.   That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.   This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

297.   Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS.   That money is still due and owing and that debt remains undischarged.

298.   That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein.   Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

299. Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### v. The Hartford Financial Services Group, Inc.

300. The Hartford Financial Services Group Inc. (also known as Hartford Insurance of Illinois, The Hartford Accident & Indemnity Company) provides a variety of liability coverage including automobile, property and life insurance. The Hartford Financial Services Group, Inc. is headquartered in Hartford, Connecticut. The Hartford Financial Services Group Inc. is incorporated in the state of Delaware. It may be served through its registered agent Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120.

301. Any and all acts alleged herein to have been committed by Defendant The Hartford Financial Services Group, Inc. were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

302. That Relator knows from personal transactions with Defendant The Hartford Financial Services Group, Inc. and its aforementioned subsidiaries as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant The Hartford Financial Services Group, Inc. in personal injury claims, cases and resolutions in this and every other jurisdiction

nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

303.    That Defendant The Hartford Financial Services Group, Inc., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

304.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

305.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

306.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law,

Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit R, attached General Releases involving: Adjuster: Kris Palski, #PA0003219967; Adjuster: Xanthe Sasser, #PA0007140983.

307. That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

308. Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

309. That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply

85

inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

310. Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### ii. Trucking Companies

311. Self-insurance is a risk management method that companies use in which, instead of purchasing more traditional liability insurance, a calculated amount of money is set aside to compensate for potential future loss. A company that is self-insured will calculate the monies to be set aside by using actuarial and other insurance information. The set aside money is similar to a traditional insurance premium and should be large enough to cover future uncertain losses.

312. It is common practice in the trucking industry for companies to be self-insured. By opting for self-insurance, a trucking company can lower traditional insurance costs by reducing collateral requirements that are needed when a large-deductible program is used. The companies also have more control over their claims handling, which helps in controlling costs. Typical liability limits for trucking companies are $1 million for the transportation of general goods and $5 million for the transportation of hazardous materials.

### a. FedEx Corporation

313.   FedEx Corporation (also known as Federal Express Corporation), more commonly referred to as FedEx, is the parent company of the following operating companies: FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, and FedEx Services.   FedEx, through its operating companies, specializes in shipping and delivery.   It is headquartered in Memphis, Tennessee.   With the exception of FedEx Custom Critical, all the FedEx entities are incorporated in the state of Delaware. FedEx Custom Critical is incorporated in the state of Ohio.

314.   FedEx Corporation may be served through its registered agent CT Corporation System, 800 S. Gay St., Suite 2021, Knoxville, Tennessee 37939.

315.   FedEx Express and FedEx Ground may be served through the registered agent CT Corporation System, 2390 E. Camelback Road, Phoenix, Arizona 85016.

316.   FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, and FedEx Services may be served through the registered agent CT Corporation System, 800 S. Gay St., Suite 2021, Knoxville, Tennessee 37939.

317.   Any and all acts alleged herein to have been committed by Defendant FedEx Corporation were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

318.   Any and all acts alleged herein to have been committed by Defendant FedEx Express were committed by officers, directors, employees, representatives, or agents, who at all

times acted on behalf of the named defendants and within the course and scope of their employment.

319. Any and all acts alleged herein to have been committed by Defendant FedEx Ground were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

320. Any and all acts alleged herein to have been committed by Defendant FedEx Freight were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

321. Any and all acts alleged herein to have been committed by Defendant FedEx Office were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

322. Any and all acts alleged herein to have been committed by Defendant FedEx Custom Critical were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

323. Any and all acts alleged herein to have been committed by Defendant FedEx Trade Networks were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

324.    Any and all acts alleged herein to have been committed by Defendant FedEx Supply Chain Solutions were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

325.    Any and all acts alleged herein to have been committed by Defendant FedEx Services were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

326.    FedEx Express, FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, FedEx Services are related entities/individuals sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit, all of them can and should be considered as a single entity at law and equity.

327.    That Relator knows from personal transactions with Defendants FedEx Express, FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, FedEx Services and their aforementioned subsidiaries as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendants FedEx Express, FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, FedEx Services

in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

328.    That Defendants FedEx Express, FedEx Express, FedEx Ground, FedEx Freight, FedEx Office, FedEx Custom Critical, FedEx Trade Networks, FedEx Supply Chain Solutions, FedEx Services, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

329.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

330.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.  That debt and those monies are still due and owing Medicare/CMS.

331.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with

Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit S, attached General Release involving John R. Simet and Federal Express.

332.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

333.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

334.    That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the

exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

335.    Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### b.  Other Companies

### i.  J.B. Hunt Transport Services, Inc.

336.    J.B. Hunt Transport Services, Inc. (also known as J.B. Hunt Transport, Inc.) is one of the largest transportation logistics companies in North America providing transportation services nationwide.  Its principal place of business is in Lowell, Arkansas.  J.B. Hunt Transport Services, Inc. is incorporated in the state of Arkansas.  It may be served through its registered John Roberts, 615 J.B. Hunt Corp. Drive, Lowell, Arkansas 72745.

337.    Any and all acts alleged herein to have been committed by Defendant J.B. Hunt Transport Services, Inc., were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

338.    That Relator knows from personal transactions with Defendant J.B. Hunt Transport Services, Inc. and its aforementioned subsidiaries as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant J.B. Hunt Transport Services, Inc. in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

339.    That Defendant J.B. Hunt Transport Services, Inc., by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

340.    That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

341.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor

reimburse Medicare for its expenditures. That debt and those monies are still due and owing Medicare/CMS.

342. Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit T, attached General Release involving; Adjuster: Cindy Gleason at (479) 659-6157 involving Freddie J. Mauzon and J.B. Hunt Transport Inc.

343. That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney. This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

344. Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], Defendant Insurance Company did knowingly and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of

all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

345. That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

346. Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

### ii. U-Haul International

347. U-Haul International (also known as U-Haul Company of New York, Inc.), more commonly referred to as U-Haul is North America's largest do-it-yourself moving and storage operator. U-Haul International is headquartered in Phoenix, Arizona. U-Haul International is incorporated in the state of Nevada. It may be served through its registered agent CT Corporation System, 2390 E. Camelback Road, Phoenix, Arizona 85016.

348. Any and all acts alleged herein to have been committed by Defendant U-Haul International were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

349. That Relator knows from personal transactions with Defendant U-Haul International and its aforementioned subsidiaries as well as other liability carriers, and in dealing and negotiating with it and their agents, adjustors and attorneys and from other experiences as set forth hereinafter, that Defendant U-Haul International in personal injury claims, cases and resolutions in this and every other jurisdiction nationwide required and received from the beneficiary/claimant a "full general release" for any and all claims arising out of the incident including, without reservation, medical expenses, which releases also contained indemnification clauses from claimants in the event that any liens (Medicare) were subsequently asserted against the carrier.

350. That Defendant U-Haul International, by accepting the "general release" which included medical expense claims, was accepting liability [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] for medical expenses as defined by the Medicare Statute and Regulations.

351. That said Defendant did settle personal injury claims with and through Relator for his clients where medical expenses were not a part of the settlement and where any and all subrogation rights, including those of Medicare, were preserved, and the Defendant's adjusters, agents and attorneys were aware of the reservation of rights and its ramifications upon Medicare and other subrogees.

352.    That said Defendant, after accepting releases from Relator with the aforesaid reservations, thereby accepting liability as per the Medicare statute [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)], said Defendant nevertheless failed to notify, obtain a conditional demand nor reimburse Medicare for its expenditures.    That debt and those monies are still due and owing Medicare/CMS.

353.    Though this was a national corporate practice as well as an industry wide scheme, Relator dealt specifically, on the representative examples referenced and attached, with Defendant's representatives and claim adjusters identified below on or about the date contained in the attached General Releases and in many of those instances, though required by law, Medicare was neither notified nor repaid by the Defendant carrier. See Exhibit U, attached General Release involving: Adjuster: Neil Salters, #16-F-02780.

354.    That this scheme or *modis operandi* of avoiding advising or notifying Medicare/CMS as well as avoiding reimbursing Medicare/CMS was fine tuned by Defendant Insurance Company as its, and the entire liability insurance industry's, general releases were refined so as to ostensibly shift the responsibility, burden and risks of consequences of the failure to repay Medicare to the claimant and his attorney.    This was accomplished through more and more sophisticated indemnification clauses as demonstrated in the representative samples attached hereto and more generally as set forth in the industry's general releases. (See paragraphs 395-404 herein)

355.    Despite the fact that by accepting the settlement document/contract/general release, Defendant was, *defacto*, accepting liability for Medicare reimbursement [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)],  Defendant Insurance Company did knowingly

and intentionally avoid repaying Medicare/CMS the monies it owed by intentionally not contacting Medicare/CMS, not advising Medicare/CMS of either the existence or resolution of all such claims over the years involved herein and by not repaying Medicare/CMS. That money is still due and owing and that debt remains undischarged.

356.  That Defendant knowingly and intentionally did not advise nor repay Medicare/CMS on thousands of claim resolutions involving Medicare recipients whose medical expenses were paid by Medicare involving hundreds of different claimant's attorneys using, the exact same scheme as outlined herein. Those amounts are readily determinable by simply inquiring of CMS the amounts outstanding, due and owing relative to those Medicare claimants by cross referencing the General Releases that Defendant has, to this point, hidden and not revealed to CMS.

357.  Relator, through his experience, contact with other Plaintiffs and Defense counsel nationwide, through his lectures on the subject of Medicare reimbursement as well as local and national publications he has authored including journal articles, book chapters and books, has personal knowledge that this scheme was applied by this defendant, not just in the specific examples set forth in this complaint and attachments hereto, but was also employed generally and throughout the industry nationally, by all the Defendants herein.

## IV.  STATUTORY BACKGROUND

### A. Medicare Secondary Payer Act

358.  The Medicare Program, established in 1965 by Title XVIII of the Social Security Act, is the federal program that provides hospital coverage for Americans who are sixty-five years of age or older and long-term disabled persons. *See* 42 U.S.C. § 1395 *et seq.*

98

359. In 1980, Congress passed the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b), by amending the enabling Medicare statute. Congress enacted the legislation to ensure that the Medicare program would not be responsible for the payment of beneficiaries' medical services when payment should have or could have been paid from other sources such as insurance companies. The Medicare Secondary Payer Act is a statutory reimbursement mechanism that ensures the government the right to recover the funds that Medicare conditionally paid on behalf of a Medicare beneficiary.

360. Even though it was Congress' intent to classify Medicare as a secondary payer, the statute as originally written did not clearly delineate Medicare's or other payers' responsibilities. This lack of specificity was clearly demonstrated twenty-three years following the 1980 enactment of the Medicare Secondary Payer Act, when the courts determined that Medicare could not recover its expenditures to Medicare beneficiaries under liability actions. Three cases in particular held that the Medicare program did not have this right to reimbursement. See *Thompson v. Goetzmann*, 315 F.3d 457 (5th Cir. 2002); *United States v. Baxter International Inc.*, 345 F.3d 866 (11th Cir. 2003); *Mason v. American Tobacco Co.*, 347 F.3d 36 (2d Cir. 2003). These three cases determined that Medicare's payments for injuries causally related to a lawsuit were not conditional payments that triggered the Medicare Secondary Payer Act. Additionally, the cases held that Medicare did not have a right to reimbursement from the plaintiff or from anyone holding the tortfeasor's funds absent a mass tort.

361. In 2003, in response to these cases, Congress amended the Medicare Secondary Payer provisions of the Medicare Act, essentially overruling these judicial decisions. The

legislation clarified when the Medicare Secondary Payer Act provisions are triggered and that Medicare is considered a secondary payer under such circumstance.

362.    As outlined in the Medicare Secondary Payer Act, and the statute's implementing regulations under 42 C.F.R. § 411.20 *et seq.*, in circumstances wherein another payer is ultimately responsible for the payment of health services and items provided to a Medicare beneficiary, Medicare is categorized as the "secondary" payer and its payments are classified as "conditional" payments. 42U.S.C. §1395y(b)(2)(B)(i); 42 C.F.R. § 411.20 *et seq*.

363.    Medicare is considered the secondary payer when "a primary payer which includes [an]....automobile or liability insurance policy", or a company that is self-insured, is reasonably expected to pay for the health care items and services provided to Medicare beneficiaries. 42U.S.C.1395y(b)(2)(A)(ii)

364.    If the primary payer (liability insurer) has not made or cannot reasonably be expected to make prompt payments for those health care items or services, then Medicare may make a conditional payment on the beneficiary's behalf for such items and services. 42U.S.C. §1395yb(2)(B)(i). The payments are made on the condition of reimbursement from the primary payer. 42U.S.C. §1395y(b)(2)(B)(i).

365.    A primary plan's responsibility for reimbursing Medicare arises upon a final judgment, a payment conditioned upon the recipient's compromise, waiver, or release, (regardless of a determination of admission or liability), or payment for items or services included in a claim against a primary plan, the primary plan's insured or by other means. 42U.S.C.§1395y(b)(2)(B)(ii). "A primary plan...shall reimburse the appropriate Trust Fund for any payment made by the Secretary...if it is demonstrated that such primary plan has or had a

responsibility to make payments with respect to such item or service. A primary plans responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release". Congress made the amendment retroactive to 1980, the initial enactment of the Medicare Secondary Payer Act.

366.    Primary payer is also defined under 42C.F.R. §422.21 as any entity that is or was required or responsible to make payment with respect to an item or service (or any portion thereof) under a primary plan. "These entities include, but are not limited to, insurers or self-insurers, third party administrators, and all employers that sponsor or contribute to group health plans or large group health plans." 42C.F.R. §422.21. Responsibility to pay under a primary plan determines whether an entity qualifies as a primary payer.

367.    Primary plan's obligations to repay Medicare are defined under the Medicare Secondary Payer Act: "a primary plan, and an entity that receives payment from a primary plan, shall reimburse Medicare for any payment made… with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42U.S.C. §1395y(b)(2)(B)(ii).

368.    "A primary payer…must reimburse CMS for any payment if it is demonstrated that the primary payer has or had responsibility to make payment." 42CFR 411.22(a)

369.    The 2003 amendments also clarified the definition of a "self-insured plan": "an entity that engages in a business, trade or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by failure to obtain insurance, or otherwise) in whole or in part." Id.

370. The government's right to initiate recovery begins "as soon it learns that payment has been made or could be made under worker's compensation, any liability or no-fault insurance, or an employer group health plan." 42C.F.R. §411.24(b).

371. "In the case of liability insurance settlements and disputed claims...if Medicare is not reimbursed...the third party payer [liability insurer] must reimburse Medicare even though it has already reimbursed the beneficiary or other party." A primary plan remains responsible for the payments to Medicare, even if payment has already been made to the Medicare beneficiary. 42C.F.R. §411.24(i).

372. In *U.S. v. Stricker*, No. CV 090BE-2423-E, 2010 WL 6599489 (N.D. Ala Sept. 20, 2010), the government brought suit against defense insurance carriers (primary payers) under the Medicare recovery sections cited above. Although the case was ultimately stricken on statute of limitations grounds, it was never suggested by the parties, or the court, nor even CMS, that the government lacked a direct right of action against the insurance companies for reimbursement. On appeal, the Eleventh Circuit affirmed the district court's decision, noting that "the government is granted an independent cause of action to sue and assert its own claim against the primary payer". See *U.S. v. Stricker,* 524 Fed. Appx. 500, 504 (11th Cir. 2013). The court further observed that "The Act allows the government to sue the insurer [which, because of the settlement, has been demonstrated to be the primary payer]...if Medicare is not reimbursed as required...the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party". *Id.*

373. An article by former Assistant U.S. Attorney Robert Trusiak also explains the obligations of liability insurers to reimburse Medicare for conditional payments. *See* Robert G.

Trusiak, "The Medicare Secondary Payer Statute", *New York State Bar Association Journal*, page 39 (Jan. 209), attached as Exhibit V. Trusiak observed that "The MSP statute and implementing regulations make it especially clear that ...a primary plan [primary payer]...shall reimburse Medicare for any payments made." *Id.* at 40.

## V.   COLLATERAL ISSUE

374.   Congress amended the Medicare Secondary Payer Act through Section 111 of the Medicare, Medicaid and State Children Health Insurance Program Extension Act of 2007. This "motivational" amendment established after several delays in implementation, that beginning October 1, 2011, "Responsible Reporting Entities," were required to notify Centers for Medicare and Medicaid Services of all settlement activity that includes a Medicare beneficiary. The Responsible Reporting Entities were identified as applicable plans under this section and included liability insurance, including self-insurance plans, no-fault insurance plans and workers' compensation laws or plans. 42 U.S.C. §1395y(b)(8)(E).

375.   These Responsible Reporting Entities, liability insurers, became required to determine whether a claimant, even one with unresolved claims was entitled to Medicare benefits, 42 U.S.C. §1395y(b)(8)(A)(i) and, if so, they became required to provide Medicare with the claimant's identity and other such information needed to ultimately ensure reimbursement. 42 U.S.C. §1395y(b)(8)(B).

376.   Under this section, 42 U.S.C. §1395y(b)(8)(E), if the Responsible Reporting Entity on or after October 1, 2011 does not "notify" Medicare of the existence of a claim, it "shall" be subject to a civil fine of $1,000 for every day that it fails to comply with the reporting requirements. The "shall" cited above was amended to read "may" effective Jan 1, 2013. This

notification of a pending claim is an entirely different section of the Medicare statute and has nothing to do with the claims being made herein. The above section of the statute does not interact with nor in any way modify the mandates, requirements and obligations of liability insurers to repay Medicare upon receipt of a release and establishment of a "debt" in liability cases.

377.    This supplement to the SCHIP Act, though delayed in its enactment, has apparently raised the consciousness of liability insurers generally such that there appears to be more compliance with Medicare reimbursement then during the time periods cited herein when there was, essentially, complete avoidance.

378.    Despite, however, the appearances of increased compliance, all the defendant insurers are expanding their indemnification phraseology in General Releases. The Defendants still seek to protect their interests, avoid their obligation of insuring repayment by co-opting and intimidating claimants and their attorneys with ever broadening indemnification clauses.

379.    The above cited section relative the failure to "report" is entirely distinct and totally independent of the MSP sections and responsibilities to reimburse and repay under which this suit is bought. This suit is directed at the simple proposition that Medicare is entitled and required to be repaid its medical expenditures upon resolution of a personal injury claim as demonstrated and documented by the general release. [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)]

## VI.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

380.    As an attorney practicing in the liability insurance field, Hayes knows that the named Defendant insurance companies and, in fact, the entire liability insurance industry

nationwide, have known of their statutory obligation to reimburse Medicare as a secondary payer since the 2003 amendment of the Medicare Secondary Payer statute. Hayes knows through his legal practice that the Defendants made no effort to contact and/or notify Medicare neither during nor after the settlement process of liability claims that involve Medicare beneficiaries during the time periods referenced herein. He further knows that in the majority of settlements, the Medicare recovery units/CMS did not know of the personal injury lawsuits involving Medicare beneficiaries, much less of any subsequent recovery or settlement. Instead, Hayes knows the standard practice in the liability insurance field has been, when settling a case where the claimant is a Medicare beneficiary, is for the liability carrier to demand a full general release with indemnification provisions, permit the disbursal of the settlement proceeds, and avoid either notifying Medicare of the settlement or fully reimbursing the program for the conditional payments it made as a secondary payer on behalf of the Medicare beneficiary.

381. That all named Defendants in nearly all other personal injury cases and resolutions nationwide in this and all other jurisdictions required and received from the claimant/beneficiary a "full general release" that included a release of all claims including medical expenses. By definition, Defendants were accepting liability and recognizing that they owed money for medical reimbursement. For all time periods cited herein, Defendants knowingly and intentionally did not contact Medicare/CMS, did not advise Medicare/CMS of the case resolution and did not repay Medicare the expenditures that they incurred as a result of the injuries and treatment arising out of the accident and claim. That debt and the money is still due and owing.

382. As a professional in the liability insurance field, and as a frequent lecturer and author on the issue of Medicare reimbursement, Hayes has personal knowledge of the Defendant

insurance companies' failure to notify Medicare, and failure to include adequate provisions in the general releases that ensure Medicare, as a secondary payer, receives full reimbursement of its health care expenditures.  Hayes knows that the standard practice of Defendants' and all liability insurers' avoidance of notifying and/or reimbursing Medicare upon settlement of the insurance claims occurs on a national and industry wide level.

383.   In the course of Relator's extensive work in the field of medical expense reimbursement, as well as in his personal private practice, Relator became aware of the insurance carriers' and self-insureds' intentional and calculated tactics to attempt to avoid Medicare reimbursement and to shift the burden and threat of risks of non-compliance to the plaintiff through indemnification clauses included in their general releases.

384.   Initially, Defendants/liability insurers simply totally ignored their Medicare reimbursement requirements.  As the obligations became more obvious, they shifted their tactics to the indemnification clause device.  In all instances, they knowingly and improperly avoided their obligation to repay Medicare its medical expenditures.

385.   They co-opted Plaintiff's attorneys into their scheme though the general releases that included indemnification clauses such that if Medicare/CMS ever discovered the settlement and exchange of consideration, the claimant could be exposed and the attorney put monetarily at risk for not repaying Medicare and for not fully protecting the client's rights and recovery.

386.   Often the general release, which included a release of medical expenses, was even executed by the attorney with his personal agreement to indemnify the liability insurer if a claim against it was ever asserted by Medicare. This technique thereby attempted to shift liability, responsibility as well as the threat of possible legal malpractice by the Plaintiff's attorney, all of

which could be avoided if the Plaintiffs attorney simply kept quiet and everyone went along with the scheme.

## VII.   DEFENDANTS' FRAUDULENT AVOIDANCE OF REMITTING MONIES OWED TO MEDICARE UNDER THE MEDICARE SECONDARY PAYER ACT

### A. Triggering the Medicare Secondary Payer Act

387.   From 2003 to the present, the scenario that occurs nationwide and typically triggers the Defendants' statutory obligations under the Medicare Secondary Payer Act begins with an incident, such as a slip-and-fall or a traffic accident.  The eventual claimant suffers an injury that requires medical care and services.  The claimant receives medical care and services for such injuries.   If the claimant is a Medicare beneficiary, Medicare receives bills and conditionally pays the claims for the care and services provided.

388.   The claimant then hires an attorney to proceed with claims against the tortfeasor's insurance company or, in the instance of self-insured companies, the tortfeasor's employer.  The claim eventually moves to settlement or results in a final judgment.  In either circumstance, the Medicare Secondary Payer Act reimbursement obligation is triggered upon execution and tender of the general release.  Upon this final resolution and the exchange of contractual documentation in exchange for monetary consideration, the insurance company or self-insured company is statutorily determined responsible for reimbursement of Medicare for monies the program conditionally paid as secondary payer.   This obligation is clearly defined by the Medicare statutes and Federal Regulations. [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)]

389.   Defendants, as an industry that collectively operates throughout the United States, have knowingly disregarded their statutory obligations when settling liability claims involving Medicare beneficiaries by entering general releases that settled all claims arising out of the

incident/accident, including all medical expenses, without specifically referencing or acting upon the Defendant's responsibility as primary payer under the Medicare Secondary Payer Act for the reimbursement of the conditional payments Medicare made as a secondary payer on behalf of the Medicare beneficiary claimants.

390.    Relator has not and did not recover medical expenses on behalf of his clients for the years involved herein. Rather, since Medicare's recovery rights were by definition "subrogation", Relator preserved those rights in the releases he submitted to the Defendant insurers. By the Defendant insurance companies resolving the claims, they were defined/determined by CMS to be liable and responsible for reimbursement. [42U.S.C.1395y(b)(2)(B)(ii); 42CFR 411.22(a)] However, in Relator's cases, the injured claimants did not recover any medical expenses as those "subrogation rights" were preserved. Furthermore, it was specifically set forth by Relator in the release and in all the pleadings throughout the lawsuit that Plaintiff's claim and recovery was for "only bodily injury, pain and suffering". Medical expenses were not included as part of the settled claim and those medical expenses and subrogation rights were specifically preserved for pursuit by Medicare, if CMS so chose.

391.    In some instances in Relator's cases, the Federal Government (DOJ) became involved, engaged and negotiated its medical expense subrogation recovery claim directly with the tortfeasor's insurance carrier. Medicare recovery claims were resolved simultaneously with the claimant's personal injury suit. Relator herein did not become involved in the negotiations between Medicare/CMS and the tortfeasor's carrier. As documented by the attached agreement, it may be that the carrier involved in that suit may have been compliant with its Medicare

reimbursement responsibilities earlier than the Defendants herein. See settlement agreement attached hereto as Exhibit W.

392. In a like manner, Relator has and does contest Medicare/CMS's demand for a portion of the settlement proceeds involving his clients where the release and pleadings demonstrate that there was no recovery of medical expenses. Specifically, in a case involving Peerless Insurance Company, Claim #09-024818 and Policy #BLW0853244993, arising out of an incident on June 30, 2008, Relator is contesting the CMS demand of repayment through Appeal in the Administrative Process. At one stage of that Appeal, MSPRC agreed that the plaintiff had not recovered medical expenses. That intermediate or "temporarily final" [oxymoron] decision observed that "the case file contained legal documentation from the complaint and settlement indicating that the settlement did not include recovery of medical bills". "The Appeal Decision is favorable". (September 28, 2012) Exhibit X.

393. Via some mysterious *sua sponte* review process, the decision was reversed. The grounds for reversal had nothing to do with the statute or the laws of subrogation. Rather, there was a torturous analysis that since it was "evident that the medical treatment received was used as a basis for recovery…the beneficiary maintains responsibility to reimburse Medicare". The statute is one of subrogation. The clear evidence, which included the pleadings and Bill of Particulars, the Arbitration Decision and the General Release (Exhibit Y), all specifically alleged a claim for bodily injuries only, with medical expenses not claimed, specifically excluded and subrogation rights preserved. If medical expenses were not recovered, then that subrogation right/claim remains open for the government to pursue should it so choose. Plaintiff did not recover any monies belonging to Medicare. The decision by MSPRC is creative but well beyond any and all statutory authority. Exhibit Z. (April 15, 2013) Claimant's Appeal is pending.

394.     Therefore, Relator's claimants were and are not subject to any equitable liens by Medicare. Beneficiaries could dispute and contest any levy against them by CMS though the administrative process and ultimately into Federal Court. By contrast, the Defendant liability carriers herein who resolved the liability claims with Relator specifically and with all Medicare claimants nationally during the relevant time periods, became statutorily obligated to reimburse CMS upon execution of the settlement/resolution agreements. The only dispute open to defendants is "how much" they are obligated to repay. There is no defense to their obligation to repay the money to CMS. By accepting a general release, they became statutorily liable and responsible. Rather than either pay or defend, the Defendants liability insurers nationwide have chosen to simply ignore their statutory obligations, and have not contacted, notified or repaid CMS, ever for the contested years and time periods.

## B. Evolution of the General Release

### i. General Release Used Through 2004

395.     The content and structure of general releases had remained essentially the same for the last fifty years. Bloomberg Legal Forms created a General Release form that was widely used and accepted in liability claims settlements. Originally, the attorneys would purchase the form from Bloomberg Legal Forms, but with the advent of computer technology, most attorneys simply began to print their own forms.

396.     Until 2004, the content of these general releases was quite basic. These releases did not specify the types of claims being settled such as medical claims, or bodily injury. Rather the language used was inclusive of "all claims". The parties broadly agree to settle "all claims" between the parties arising out of a specified incident or accident. These boiler plate releases settled the claims "from the beginning of the world to the day of the date of these presents."

These general releases do not mention the Medicare program, the obligation to reimburse Medicare as a secondary payer, or the amounts owed to Medicare as a secondary payer for its conditional payments of claims as a result of the underlying incident or accident.

397. Under this type of general release, the Defendants, by accepting liability to the extent that monetary payments for personal injuries were committed to and paid, accepted the responsibility to ensure that the Medicare Secondary Payer Act's administrative procedures were followed, including where the settlement was inclusive of medical expenses, responsibility for paying Medicare for such causally related health care services or items provided to the claimant. Through this acceptance of liability under the general releases, the Defendants' insurance coverage plans, including self-insured coverage, thus are classified as primary plans, and Defendants are the primary payers.

398. Under the Medicare Secondary Payer Act, 42U.S.C.§1395y(b)(2)(B)(ii), the primary payer is statutorily liable for full reimbursement of Medicare for the conditional payments the program paid on behalf of Medicare beneficiary. In light of these known obligations, Defendants nonetheless settled their liability claims using these boilerplate general releases, as noted above, without including the repayments owed to Medicare. The Defendants concealed the Medicare Secondary Payer Act's requirements through this material omission and avoided their statutory obligations to repay Medicare for its conditional payment. Exhibit AA.

**ii. General Release Used 2005-2006**

399. In 2004, the Defendants began using slightly different General Releases that delineated the type of claims that were being settled such as "all claims for bodily injury, conscious pain and suffering, medical and all other expenses arising from an incident..."

Although these General Releases specified the types of claim being settled, the releases continued to omit information relating to Medicare, the Defendants' responsibility to reimburse Medicare as a secondary payer, and any specific amounts under the settlement designated as reimbursement to Medicare for the conditional payments it made to a Medicare beneficiary for injuries as a result of the incident that was being settled. The Defendants continued to conceal and avoid their responsibilities as primary payers under the Medicare Secondary Payer Act.

400. Additionally, by not including Medicare and the payments owed thereto in the general releases, the Defendants did not take into consideration the actual monies owed to Medicare. The Defendants as payers settled these cases taking into general account and responsibility for the "bodily injuries and "conscious pain" suffered by claimant. The Defendants opted to omit a specific accounting of the actual claims paid by Medicare for the services and items required for such injuries and pain. By not taking into account the specific amounts owed to Medicare as a secondary payer, Defendants as primary payers also effectively reduced their monetary liability under the settlements. Exhibit BB.

### iii. General Release Used 2007-2010

401. By 2006 the Defendants started using General Releases that required the Medicare beneficiary claimant to indemnify the Defendants against Medicare for any claims the federal program had for reimbursement of its conditional payments made under the Medicare Secondary Act. Under these General Releases, the Defendants first required the claimant to assert that there existed no enforceable liens against the settlement proceeds, including any Medicare lien. Then, the Defendants required that if such a lien were to be asserted, the claimants agreed to indemnify the Defendants and pay and satisfy the lien. Of note and

significance, the Defendant carriers made no attempt to either reimburse Medicare directly or ensure that it was repaid. These General Releases did not include any provisions relating to the Defendant's obligations under the Medicare Secondary Payer Act. Rather, the Defendants used an indemnification provision in an attempt to shift responsibility for repayment to the claimant or his attorney and to assist them in concealing their obligations as primary payers. Defendants, thus, concealed their statutory requirements as primary responsible payers and avoided their responsibility to reimburse Medicare under the Medicare Secondary Payer Act. Exhibit CC.

### iv. General Releases used 2011-2012

402.   Finally in 2011, the Defendants began to use a General Release wherein the claimant would identify whether he/she was a Medicare beneficiary. These releases required the claimant to assert in the negative, that he/she was "not Medicare eligible" and "that none of the bills for medical treatment provided as a result of the accident were paid by Medicare Part A or Part B." By requiring the claimant to negatively assert that he/she is neither Medicare eligible or that resulting medical claims have not been paid by Medicare, the Defendants are still avoiding their primary payer responsibilities under the Medicare Secondary Payer Act.

403.   Furthermore, through using these releases, the Defendants continue to try to make the claimants responsible for any reimbursements. The claimants are required to acknowledge that any payments to Medicare as a result of the settlement will come out of the claimants' portion of the settlement proceeds even when such repayments may encompass the entirety of those proceeds the Defendants, liability carriers and self-insureds continue to avoid any direct involvement or communication with Medicare/CMS in expanse reimbursement even thought by statute they are primarily liable. Regardless of the type of general release the Defendants use,

the Defendants continue to conceal and/or avoid their statutory responsibilities as primary payers to Medicare under the Medicare Secondary Payer Act.

404.    In sum, as explained above, whenever any of the Defendants settle a liability claim as to a Medicare beneficiary, the Medicare Secondary Payer's responsibilities were (and are) triggered.  As the Defendants under the settlement assume the liability for the claim, they are classified as the primary payer.  As the primary payer, the Defendants are responsible for the full reimbursement to Medicare for the conditional payments made by Medicare on behalf of the Medicare beneficiary. Defendants consistently conceal and avoid their statutory obligations through general releases by failing to mention the payments owed to Medicare.  Defendants cannot avoid their statutory obligation to fully reimburse Medicare by attempting to assign the responsibility to the claimant and/or his/her attorney through indemnification provisions in the releases.  The Defendants instead remain obligated to Medicare for its conditional payments made as secondary payer. Exhibit DD.

## VIII.   ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT

### A.  Applicable Law

#### i.   The False Claims Act

405.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Hayes arising from the false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

406.    For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides in pertinent part that:

(a) Any person who

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    (3)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

    ***

    (7)    knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claims. 31 U.S.C. § 3729(a).

407.    The FCA defined "knowing" and "knowingly" as:

(A) Mean[ing] that a person, with respect to information

    (i)    has actual knowledge of the information;

    (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

    (iii)    acts in reckless disregard of the truth or falsity of the information

(B) require[ing] no proof of specific intent to defraud.  31 U.S.C. §3729(b)(1)(i).

408.    The FCA defined the term "obligation" as "an established duty, whether or not fixed arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee based or similar relationship, from statute or regulation, or from the retention of an overpayment." 31 U.S.C. §3729(b)(3).

409.    For conduct occurring after May 20, 2009, the FCA provides that any person who

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008)

    (C)    conspires to defraud the Government by committing a violation of the FCA;

    \*\*\*

    (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. 31 U.S.C. § 3729(a)(1).

410.    The amended FCA defines "knowing" and "knowingly" as

(A) Mean[ing] that a person, with respect to information –

    (i)    has actual knowledge of the information

    (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

    (iii)    acts in reckless disregard of the truth or falsity of the information; and

(B) require[ing] not proof of specific intent to defraud. 31 U.S.C. §3729(3)(b)(1).

411.    The amended FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any over payment. 31 U.S.C. §3729(3)(b)(3).

412.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

413.    Based on these provisions, Relator Hayes, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants failure to remit payment to Medicare that was due and owing under the Medicare Secondary Payer Act's provisions.    In this case, Defendants were responsible for fully reimbursing Medicare all monies it provided as conditional payments to Medicare beneficiaries under the Medicare as Secondary Payer Act.    The United States has suffered significant damages.

414.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Hayes is an original source as defined therein.    Relator Hayes has direct and independent knowledge of the information on which the allegations are based.    To the extent that any allegations or transactions herein have been publicly disclosed, Relator Hayes has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.    As required pursuant to 31 U.S.C. § 3730(b) and (e), Relator Hayes has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence, and information, related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the United States and the United States Attorney for the Western District of New York.    Contemporaneously with filing, Relator has provided all material documents related to this Complaint to the Attorney General of the United States and the United States Attorney for the Western District of New York.

415.    This Complaint details Relator Hayes's discovery and investigation of the Defendants' fraudulent schemes and is supported by documentary evidence.

**B. Defendants' Violation of the FCA**

**i.  Defendants' Failure to Remit Monies Owed to Medicare under the Medicare Secondary Payer Act Violates the FCA former 31 U.S.C. §3729(a)(7); current 31 U.S.C. §3729(a)(1)(G))**

416.    When settling liability claims, Defendants did not reimburse Medicare the monies that Medicare paid on behalf of its beneficiary claimants as a secondary payer under the Medicare Secondary Payer Act.  As a secondary payer, Medicare initially made conditional payments on beneficiaries' behalf for health care items and services in the circumstances wherein the rightful primary payer – liability insurance company or self-insured company – did not pay or, with reasonable expectation, would not promptly pay for such services.

417.    Defendants under 42 U.S.C. § 1395y(b) have a statutory obligation to reimburse Medicare upon settlement of liability insurance claims when Medicare as secondary payer has made conditional payments on Medicare beneficiaries' behalf.  Since 2003 and all times mentioned herein, Defendants have known of their statutory obligation to fully reimburse Medicare for such payments under the Medicare Secondary Payer Act.  With conscious, intentional and reckless disregard of their responsibilities and obligations, however, Defendants have entered into general releases settling liability claims with Medicare beneficiary claimants without insuring that Medicare would receive full reimbursement for the monies the program conditionally paid on the beneficiary's behalf.

418.    Defendants utilized boiler plate general releases with Medicare beneficiary claimants that did not include any language for full reimbursement to Medicare as a secondary payer and did not ensure that Medicare was reimbursed.  Alternatively, Defendants prepared

general releases that attempted to shift the responsibility to the claimant to fully reimburse Medicare, thus completely avoiding their statutory obligation to reimburse Medicare as required under the Medicare Secondary Payer Act. As a result of Defendants' conduct in settling liability claims with Medicare beneficiary claimants and by failing to notify nor repay Medicare, Defendants have fraudulently avoided the repayment of millions to the public fisc. Since 2003 and extending to the present, Defendants have knowingly concealed and/or knowingly and improperly avoided or decreased their obligation to pay or transmit money or property to the government in violation of the False Claims Act under former 31 U.S.C. § 3729(a)(7) and current 31 U.S.C. § 3729(a)(1)(G).

## IX.   CAUSES OF ACTION

### A. COUNT I - REVERSE FALSE CLAIMS (former 31 U.S.C. § 3729(a)(7); current 31 U.S.C. 3729(a)(1)(G)).

419.   Relator realleges and hereby incorporates by reference each and every allegation contained in the all paragraphs of this Complaint.

420.   Since 2003, Defendants when settling liability claims have not reimbursed Medicare the monies that Medicare paid on behalf of its beneficiary claimants as a secondary payer under the Medicare Secondary Payer Act. Defendants under 42 U.S.C. § 1395y(b) have a statutory obligation to reimburse Medicare upon settlement of liability insurance claims when Medicare, as secondary payer, has made conditional payments on Medicare beneficiaries' behalf. From 2003 to the present, Defendants have, in a nationwide scheme, knowingly concealed and/or knowingly and improperly avoided or decreased their obligation to pay or transmit money or property to the government by not reimbursing Medicare, by entering into boiler plate general releases with Medicare beneficiary claimants that did not include any language as to the full

reimbursement of Medicare as a secondary payer and did not ensure that Medicare was fully reimbursed for the conditional payments Medicare made on the beneficiaries' behalf. During this time period, Defendants have also entered into general releases that attempted to shift the responsibility to the claimants to fully reimburse Medicare, and thus completely avoided and ignored their statutory obligations under the Medicare Secondary Payer Act.

421.    Through the use of these general releases and Defendants conduct in settling their liability claims, Defendants, since 2003 to the present, have knowingly concealed and/or knowingly and improperly avoided or decreased their obligation to pay or transmit money or property to the government in violation of the False Claims Act under former 31 U.S.C. § 3729(a)(7) and current 31 U.S.C. § 3729(a)(1)(G).

## RELIEF

422.    On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

423.    The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

424.    The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

## PRAYER

425.    WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Defendants for the following:

   a.  Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

   b.  Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

   c.  The maximum amount allowed pursuant to 31 U.S.C. §3730(d);

   d.  All costs and expenses of this litigation, including attorney's fees and costs of court;

   e.  All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

## X.   JURY DEMAND

426.   Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully Submitted,

By: s/ Timothy G. O'Connell, Esq.               By: s/ Peter M. Jasen, Esq.

Timothy G. O'Connell, Esq.                       Peter M. Jasen, Esq.
GELBER & O'CONNELL, LLC                    PETER M. JASEN, PC
6512 Main Street                                69 Delaware Avenue – Suite 1111
Buffalo, New York 14221                       Buffalo, New York 4221
Telephone: (716) 633-5050                    Telephone: (716)848-9500
e-mail: toconnell@gelberoconnell.com         e-mail: pmj@jasenlaw.com

**Attorneys in Charge of
Relator J. Michael Hayes**

121

## VERIFICATION

STATE OF NEW YORK     )
                                  )
COUNTY OF ERIE          )

        J. MICHAEL HAYES, as Relator, being duly sworn, deposes and says that I am the Plaintiff in this action, that I have read the foregoing Verified Complaint and know the contents thereof, and the same are true to my knowledge, information and belief.

                                         s/ J. Michael Hayes
                                         J. MICHAEL HAYES, RELATOR

Sworn to and subscribed before
me this 14th day of April, 2014.

s/ Serena R. Tabor
Notary Public

Serena R. Tabor
Notary Public, State of New York
No. 01TA5930186
Qualified in Erie County
Commission Expires July 5, 2014

**EXHIBITS TO AMENDED COMPLAINT**

| Exhibit No. | Type of Document | Date of Document | Bates No. |
|---|---|---|---|
| A | Allstate Releases | 2003-2005, 2007, 2009, 2010 | |
| B | Zurich Releases | 2007-2007 | |
| C | GEICO Releases | 2008-2010 | |
| D | GMAC Releases | 2005, 2008 | |
| E | Kemper Releases | 2006, 2009 | |
| F | Liberty Releases | 2005-2008, 2010 | |
| G | Erie Releases | 2006, 2007, 2009, 2010 | |
| H | MetLife Releases | 2007, 2008, 2010 | |
| I | Nationwide Releases | 2006, 2007 | |
| J | Progressive Releases | 2006, 2007 | |
| K | Utica Releases | 2005, 2007-2009 | |
| L | Prudential Releases | 2004, 2005 | |
| M | Travelers Releases | 2007-2009 | |
| N | Daimler-Chrysler Release | 2005 | |
| O | New York Central Releases | 2008-2010 | |
| P | Preferred Releases | 2008 | |
| Q | State Farm Releases | 2006-2008 | |
| R | Hartford Releases | 2006, 2008 | |
| S | FedEx Release | 2003 | |
| T | J.B. Hunt Release | 2008 | |
| U | U-Haul Release | 2007 | |
| V | Robert G. Trusiak Article | 2009 | |
| W | Government Negotiations with Carriers Example | 2007 | |
| X | Relator's Contesting of CMS Demand of Repayment in Administrative Process | 2012 | |
| Y | Documents Supporting and Claim for Award of Medical Expenses | 2011 | |

| Z | CMS/Medicare Decision | 2013 | |
|---|---|---|---|
| AA | General Release Examples | 2003-2004 | |
| BB | General Release Examples | 2005-2006 | |
| CC | General Release Examples | 2007-2010 | |
| DD | General Release Examples | 2011-2012 | |